## CASTANOLA and others v. MISSOURI PAC. R. Co.

*(District Court, W. D. Texas. 1885.)*

SALE—STOPPAGE IN TRANSITU—TRANSFER OF "DUPLICATE" BILL OF LADING—NOTICE—INSOLVENCY OF VENDEE.

On February 6, 1884, D. sold to T. 25 hogsheads of tobacco, and shipped them by rail to him, taking two bills of lading, one marked "original," and the other "duplicate." The "duplicate" bill of lading and invoice were transmitted to T., and the "original" was attached to a 60-days draft drawn by D. on T., and sent through a bank for acceptance. T. on receipt of the "duplicate" transferred it by indorsement to C., with whom he had contracted to sell the

tobacco, and received payment therefor; and on presentation of the "original" and draft the next day, refused to accept the draft, and it was returned to D. On February 24, 1884, T. failed, and D. ordered the goods, then in transit, to be stopped. On February 27 and 29, 1884, C. demanded the goods of the railroad company, and was informed that they had been stopped in transit by D. and shipped back to them; whereupon C. sued the company to recover the value of the goods, claiming to be an innocent purchaser for value. *Held*, (1) that the transfer of the "duplicate" bill of lading for value did not carry with it necessarily the title to the goods; and (2) that C. had notice before he paid for the goods, which should have put him on inquiry as to what disposition had been made of the "original" bill of lading, and therefore did not acquire a legal title to the goods that would defeat the right of the consignor to stop them in transit.

TURNER, J. In this case the plaintiffs sue defendant for the non-delivery of 25 boxes of tobacco. The facts developed by the evidence are substantially as follows:

About the last of January, 1884, (I think the 28th,) a member of the firm of Turnley Bros. & Co., grocers, residing and doing business at Galveston, Texas, came to this place, (San Antonio,) and contracted with this plaintiff for 25 boxes of "Drummond Horseshoe Tobacco." That about the sixth of February thereafter, Turnley Bros. & Co. gave to the agent of the Drummond Tobacco Company an order for tobacco; 25 boxes to be consigned to Turnley Bros. & Co. at San Antonio, Texas; also a number of boxes to be shipped to them at Galveston. On the eleventh day of February, the Drummond Company shipped the tobacco, as ordered by Turnley Bros. & Co., and taking from the railroad company (defendant) two bills of lading, one stamped "Original" and the other "Duplicate." The duplicate bill, together with the invoice, was transmitted to Turnley Bros. & Co., and the original bill of lading was attached to a 60-days draft, drawn by the consignors upon the consignees, and sent through a bank to Turnley Bros. & Co. for acceptance.

Turnley Bros. & Co., upon the receipt of the duplicate bill of lading, delivered the same to plaintiff, indorsed, without date, as follows: "Deliver to M. Castanola & Son." Signed. "TURNLEY BROS. & CO.,"—which duplicate bill of lading, together with an invoice of the tobacco, amounting to $270.50, payable in 60 days, or 2 per cent. off for cash, reached Castanola & Son, February 20, 1884. On the next day, plaintiff remitted to Turnley Bros. & Co. the amount of the invoice, less 2 per cent. off. Turnley Bros. & Co. refused to accept the draft attached to the original bill of lading, and same was returned to the Drummond Tobacco Company, and on the twenty-fourth of February, 1884, Turnley Bros. & Co. failed, and on that day it became publicly known that they had failed, and the Drummond Tobacco Company ordered the goods stopped in transit. On the 27th plaintiff presented the duplicate bill of lading to defendant, and was told that they also had a letter from Turnley Bros. & Co., notifying it of the transfer of the tobacco to plaintiffs. On the twenty-ninth of the same month, plaintiffs again demanded the tobacco, and were told by the defendant's agent that the goods had been stopped in transit by the Drummond Tobacco Company, and the tobacco shipped back to St. Louis, and delivered to the Drummond Tobacco Company. It is evident that Turnley Bros. & Co. were in failing circumstances at the time they gave the order for the goods to the Drummond Tobacco Company.

The plaintiffs bring this suit, and seek to recover of defendant the value of the goods, claiming to be an innocent purchaser for value.

The question first presented, then, is, is the purchaser, in the eyes of the law, the owner of the goods, by virtue of his having the duplicate

bill of lading assigned to him, and having paid therefor? The position taken by the defendant is that the duplicate bill of lading does not represent the goods, but the original one does; and plaintiff purchased at his peril, and that no title to the goods passed to the plaintiff; and therefore the Drummond Tobacco Company rightfully exercised their right of stoppage *in transitu.* If this position be well taken, that ends the controversy. Bills of lading are often spoken of as negotiable. This is not, legally speaking, true. They are for specific articles, and not payable in money, and are not, strictly speaking, negotiable commercial paper. See Daniel, Neg. Inst. (2d Ed.) p. 660, § 1727. They are assignable, and the bill of lading represents the property; and if the consignor assigns *the* bill of lading to an innocent purchaser for valuable consideration, the title to the goods passes to the purchaser, and such a sale would defeat the right of *stoppage in transitu* of the consignor. The difficulty arises in determining which is *the* bill of lading that represents the goods, and the transfer of which carries with it the legal title. They are called original, duplicate original, and triplicate originals. This in one sense is true. They all contain a receipt for the goods by the transportation company, as well as a contract to transport the goods to the place of delivery, and to deliver to the person entitled thereto. See authority last cited, section 1728. It cannot be argued that each one of these bills, independent of the other, represents the goods. If this proposition be conceded, it follows as a logical sequence that either some *one* of them must represent the goods, or that the three or more, (as the case may be,) taken together, represent the goods.

In the cases to which my attention has been called the term used is, where *the* bill of lading has been transferred to an innocent purchaser for value, etc., using the singular number. As I have said, these bills of lading are not strictly negotiable, but were assignable, and in some respect likened in the commercial world to original and duplicate bills of exchange. It will hardly be contended, however, that a prudent man would purchase a duplicate bill of exchange without first having ascertained that the original had not been paid. The fact that the second bill of exchange is presented suggests and gives notice that there is an original, which, if paid, renders the duplicate of no value.

Ought this rule to be applied here, either in determining which is or what constitutes *the* bill of lading, or with reference to the *bona fides* of the purchaser. It is evident that the consignors did not intend to part with title to the goods unless Turnley Bros. & Co. accepted the draft drawn upon them,—see Daniel, Neg. Inst. (2d Ed.) § 1734; and if this controversy were between the consignors and the consignees there would be but little difficulty.

This case illustrates the facility with which a consignee who is disposed to defraud the consignor can effect his purpose, if it be held that the duplicate bill represents the goods, and that its transfer to a purchaser takes thereby the legal title to the goods. I am unable to

find any adjudicated case in point. I am constrained to believe, for the reasons above indicated, that a transfer of a duplicate bill of lading for value does not carry with it the legal title to the goods, and that the purchaser in this case was put upon notice before he paid for these goods, which should have put him upon inquiry as to what disposition had been made of the original bill of lading; and that therefore, under the facts of this case, the plaintiff did not acquire the legal title to the goods, such as would defeat the right of the consignor to stop the goods while in transit.

The judgment is therefore for the defendant, with costs.

---

Notwithstanding that Judge TURNER's decision strikes one as being right and reasonable, I have had considerable difficulty in agreeing with it, because there are in the books some *dicta*, if not, in fact, several decisions, that seemingly, at least, conflict with the views expressed by the learned judge. For example, Mr. Smith[1] says: "Several parts of a bill of lading signed by the master are generally delivered to the shipper; and in some instances *the parts* have been indorsed to different persons. In such cases, the first person to whom *a part* is regularly indorsed is entitled to the goods." And Mr. Benjamin,[2] basing his remark on the decision of the house of lords,[3] says: "The person who first gets *one* bill of lading out of the set of three (the usual number) gets the property which it represents, and needs do nothing further to assure his title, which is complete, and to which any subsequent dealings with the other bills of the set are subordinate; and that though the ship-owner or wharfinger, if ignorant of the transfer of one bill of the set, may be excused for delivery to the holder of another bill of the set acquired subsequently; that fact will not affect the legal ownership of the goods as between the holders of the two bills of lading."

Inquiries of leading bankers in Chicago, however, confirm Judge TURNER's conclusion that it is highly imprudent to buy or make advances upon a "duplicate" bill of lading without requiring production of the "original," or at least an account of the same, if it should be lost. At the First National Bank the officials say: "We deal in bills of lading to the extent of $20,000,000 a year, and invariably require the original bill to be produced. Under no circumstances would we make advances upon a mere 'duplicate' bill of lading; it would be assuming a risk altogether unbusiness-like." Similar views were expressed at the Chicago National, the Commercial National, the Canadian Bank of Commerce, and the Corn Exchange National Bank. The manager of the branch of the Bank of Montreal was especially emphatic. "Why," said he, "the bill of lading is negotiable; we should certainly require the original to be produced before making advances,"—thus clearly implying that, in his opinion, the transferee of an original bill might acquire rights to the property to which the right of a bank making an advance upon a "duplicate" would be subordinate. In this apparent conflict of opinion between eminent text-writers and practical business men, I have examined the cases, including those upon which the conclusions of the text-writers are based, to ascertain (1) whether they warrant the broad, unqualified conclusion that the first *bona fide* indorsee for value of any of the parts of a bill of lading takes the goods; and (2) whether, if so, such cases are not distinguishable from that

[1] Mercantile Law, 302; citing Gurney v. Behrend, 3 El. & Bl. 622, and Gilbert v. Guignon, L. R. 8 Ch. App. Cas. 16.

[2] Benj. Sales, § 1224.
[3] Barber v. Meyerstein, L. R. 4 Eng. & Ir. App. (H. L.) 3.7.

decided by Judge TURNER, so as to take the latter out of the rule deducible from the former.

1. Does the first transferee in good faith, without notice and for value, of any part of a bill of lading, take the goods, of which it is a symbol, against all subsequent transferees? Thompson was a planter in Jamaica, heavily indebted to Caldwell & Co., in Liverpool, who were secured by mortgage of his estate. He was also heavily indebted to France & Co., in Liverpool. Thompson's agent in Liverpool was one Fairbrother. In March, 1785, Thompson shipped in the Tyger, owned by France & Co., and commanded by Ball, a large consignment of sugar and rum. He took three bills of lading from Ball. The first of these bills covered the whole cargo, and ordered delivery *to Messrs. Thompson and Fairbrother, or their assigns.* While this bill was in Thompson's possession in Jamaica, the other two were drawn for different parts of the cargo, but together making up the whole cargo, and ordered delivery *to the order of the shipper or his assigns,* and were indorsed by Thompson as follows: "Deliver the within to Messrs. Thompson and Fairbrother, provided they engage to pay the net proceeds to Messrs. France and nephew, otherwise deliver them to the order of James France and nephew, on account of Coppell and Goldwin. The last-named persons were agents of France & Co. in Jamaica, and to them were delivered these two bills of lading, while Thompson still held possession of the first bill. Thompson then sent the first bill to Fairbrother, with a letter notifying him somewhat vaguely of having indorsed the other two bills to Coppell and Goldwin. Without communicating this notice to them, Fairbrother assigned the first bill to Caldwell & Co. In the mean time, Coppell and Goldwin forwarded their two bills to France & Co., and on arrival of the Tyger in Liverpool, both Caldwell & Co. and France & Co. demanded the goods of Ball, the master. He refused to deliver to Caldwell, who thereupon brought trover against Ball. It was held that both Caldwell & Co. and France & Co., being *bona fide* holders of the bills, for value and without notice, the goods were to be awarded to whoever had obtained first the legal title and possession, which was decided to be France & Co., the second and third bills having been given to their agents, Coppell and Goldwin, and the goods being in their vessel before the first bill was transferred to Caldwell.[1]

In this case, it appears to have been the second and third parts, which, being first transferred, carried the title against a subsequent transferee of the first bill.

In *Meyerstein* v. *Barber,*[2] A. was indorsee of a bill of lading, drawn in a set of three, making cotton deliverable in London on payment of freight. The cotton had been lately landed, under an entry made by A. at a sufferance wharf in the port of London, with a stop thereon for freight. On the fourth of March, A. obtained from M. an advance of £2,500, on the deposit of two copies of the bill of lading, M. assuming the third to be in the hands of the master. On the sixth of March, the stop for freight being then removed, A., who had in February instructed B., a broker, to take samples of the cotton and to offer it for sale, obtained from B. an advance of £2,000, on the deposit of the third copy of the bill of lading, which A. had fraudulently retained. On the eleventh of March, B., being informed of the prior advance by M., sent his copy of the bill of lading to the wharf and procured the cotton to be transferred in his own name, and afterwards sold it and received the proceeds. Held, that the bill of lading, when deposited with M., retained its full force and effect; that there was therefore a valid pledge of the cotton to M., and he could maintain an action against B., either for the proceeds of the sale as money received to his use, or for wrongful conversion of the cotton.[3]

[1] Caldwell v. Ball, 1 Term R. 205.
[2] L. R. 2 C. P. 38.
[3] Meyerstein v. Barber, L. R. 2 C. P. 38.

As intimated above, this case went on appeal to the house of lords, wherein the judgment below was affirmed, and the lord chancellor, Lord HATHERLY, said: "Now, if anything could be supposed to be settled in mercantile law, I apprehend it would be this, that when goods are at sea, the parting with the bill of lading, *be it one bill out of a set of three,* or be it one bill alone, is parting with the ownership of the goods."[1] And Lord WESTBURY said: "It is unquestionable (as has been said here by one of the judges) that the handing over the bill of lading for any advance, under ordinary circumstances, as completely vests the property in the pledgee as if the goods had been put into his own warehouse. There can be no doubt, therefore, that the first person who, for value, gets the transfer of a bill of lading, *though it be only one of a set of three bills, acquires the property; and all subsequent dealings with the other two bills must, in law, be subordinate to that first one;* and for this reason, because the property is in the person who first gets a transfer of a bill of lading."[2]

The form of the bill of lading does not appear in the *Caldwell Case, supra,* but in *Meyerstein's Case* it is shown that each part contained the usual clause, "one [part] of which being accomplished, the others to stand void." These cases certainly appear to sustain the position of the text writers quoted above, that the transfer of any part of a bill of lading passes the property covered thereby. And perhaps a good reason for giving to the parts of a bill of lading all the force of originals, is suggested by the supreme court of the United States in deciding that each part of a bill of exchange is an original.[3]

"On the other hand, great inconveniences might arise from compelling the plaintiff to produce the other parts of the set, or to account for their non-production, as he might not be able, satisfactorily, to prove that they had not been negotiated, or that they had been lost. In short, if the plaintiff, before he could recover, were required to produce or to account for all the parts of the set, he would be obliged, in every case where the bills had been transmitted by different conveyances abroad, to arm himself with proofs of every stage of their route and progress, until they should come back again into his hands, as preliminaries to his right to recover upon their being dishonored. Such a requirement would create most serious embarrassments in all commercial transactions of this sort; and instead of bills drawn in sets being a public convenience, they would be greatly obstructed in their negotiability, since the rights and the remedies of the holder might be materially impaired thereby." This argument seems to me to be just as forcible when applied to bills of lading drawn in sets as to sets of bills of exchange.

2. Is the case decided by Judge TURNER distinguishable from those above given, so as to take it out of the rule established by the latter? There are two kinds of bills of lading commonly issued by railway carriers: one kind, a document containing the names of consignee and destination, describing the goods, and formulating the contract of carriage and delivery, together with the conditions made a part of it. This is the ordinary "inland" or "domestic" bill of lading, and is given in all ordinary shipments where a bill of

---

[1] Barber v. Meyerstein, L. R. 4 Eng. & Ir. App. (H. L.) 325.

[2] Barber v. Meyerstein, L. R. 4 Eng. & Ir. App. (H. L.) 336. See, also, Skilling v. Bollman, 6 Mo. App. 76; Michigan Cent. R. Co. v. Phillips, 60 Ill. 191; Railroad Co. v. Wagner, 65 Ill. 198; Vandover v. Wilmot, 10 Ben. 223; Zachrisson v. Ahman, 2 Sandf. 68; Gurney v. Behrend, 3 El. & Bl. 622.

[3] Downes v. Church, 13 Pet. 205; and see Bank of Pittsburgh v. Neal, 22 How. 96. As to the bank upon which they are drawn, each part of a bill of exchange is an original. The "second" or "third" will be paid without question upon presentation; the only inquiry by the bank being of its own book-keepers as to whether it has paid any other part besides that presented. This is not saying, however, that a person or bank, asked to discount a "second" or "third" bill drawn upon another person or bank, may safely discount the paper without inquiry as to its counterparts.

lading is required. The other kind of bill is known as the "export" bill; a similar document in substance, but of somewhat greater formality and minuteness of provision. These "export" bills are given in cases of foreign "through" shipments, and they contain a clause common to the genuine maritime bill of lading, but omitted in the "inland" railway bill just mentioned, namely: "In witness whereof, the agent signing for the said transportation and steam-ship companies hath affirmed to ———— [number of bills inserted here] ———— bill—— of lading, of this tenor and date, one of which being accomplished, the others to stand void."

This is the provision upon which rests the whole theory that each part of such a bill of lading is an original. The bill of lading contained such a clause as this in *Meyerstein's Case*, above, and from the fact that the bills in *The Caldwell Case, supra*, were maritime bills, it may be fairly presumed that they contained a similar clause, although this does not appear in the report of the case. Now the word "duplicate," written on the ordinary "inland" railway bill of lading, can hardly be fairly held to so plainly import originality like the broad, explicit clause in the maritime or "export" railway bill. I know that some decisions and *dicta* impute the force of an original to a duplicate. Thus Burrill says of duplicate: "That which is doubled or twice made; an original instrument repeated. A document which is the same as another in all essential particulars. TINDAL, C. J., 7 Man. & G. 93; MAULE, J., Id. 94. Sometimes defined to be the copy of a thing; but, though generally a copy, a duplicate differs from a mere copy in having all the validity of an original."[1] So Abbott defines a duplicate as "a transcript of a writing equivalent to the original."[2]

But a well-established popular meaning of duplicate is, "that which exactly resembles or corresponds to something else; hence a copy, a transcript, a counterpart;"[3] and it is in the sense of "copy" that it is, in my opinion, to be taken when written across an inland bill of lading. Whether it implies "originality" or merely a "copy," there are decisions which sanction Judge TURNER's view that prudence requires one buying or making advances on a "duplicate" bill to produce or account for the "original." Thus, upon application for probate of a "duplicate" will, both copies must, in England, be deposited with the registry of the court of probate.[4]

A case bearing upon the point is *Glyn, Mills, Currie & Co.* v. *East & West India Dock Co.*[5] Goods having been shipped for London, consigned to C. & Co., the ship-master signed a set of three bills of lading. marked, "First," "Second," and "Third," respectively, making the goods deliverable "to C. & Co., or their assigns; freight payable in London; the one of the bills being accomplished, the remainder to stand void." During the voyage, C. & Co. indorsed the bill of lading marked "First," to the plaintiffs for a valuable consideration. Upon the arival of the ship in London, C. & Co. entered the goods as consigned to them, and they were landed and placed in the custody of the defendants in their warehouses; the master lodging with the defendants notice, under the merchants shipping act, 1862, to detain the cargo until the freight should be paid. C. & Co. then produced to, and lodged with, the defendants the second part of the set of bills of lading. The defendants accordingly entered C. & Co. in their books as enterers, importers, and proprietors of the goods, and the stop for the freight being afterwards removed, they delivered the goods to various persons, upon delivery orders,

[1] Burrill, Law Dict. "Duplicate."
[2] Abb. Law Dict. "Duplicate;" citing Benton v. Martin. 40 N. Y. 345. See, also, Bouv. Law Dict. "Duplicate;" citing Onions v. Tyrer, 1 P. Wms. 346; Pemberton v. Pemberton, 13 Ves. 310; Roberts v.

Round, 3 Hagg. Ecc. 548. See Lewis v. Roberts, 103 E. C. L. 29.
[3] Webst. Dict. "Duplicate," (4to Ed.) 420.
[4] Rapalje & L. Law Dict. "Duplicate;" Rawson, Pocket Law Lex.
[5] 5 Q. B. Div. 129.

signed by C. & Co. Held, by FIELD, J., that the defendants were liable in an action by the plaintiffs for the value of the goods; for, without deciding whether the master could have been exonerated by a delivery of the goods to the person first presenting a bill of lading, the defendants were not, by receiving the goods, subject to the stop for freight, placed in the same position as the master and entitled to his rights; and further, that in delivering the goods upon the order of C. & Co. they had acted in a character beyond that of mere warehousemen, and were guilty of conversion.

In deciding this case, Judge FIELD said: "If it is said to be a hardship on the defendants that they should be liable for delivery upon the production of the second part of the bill of lading, without any knowledge of a previous indorsement, it may be observed that they had the remedy in their own hands, as the part so produced was conspicuously marked 'Second,' and they had only to require the production of the 'First' part, which, as is well known, is usually sent to the consignee, and, in case of the non-production of it, to take an indemnity before delivery."

"Indeed, that is the course pursued by the defendants in their East India trade, in which the original bills of lading only are accepted, and in case of loss, the defendants require satisfactory proof of title and an indemnity; thus showing that, in that trade, at least, precautions are taken which, if taken by the defendants in the present case, would have protected them against loss. If the law were held to be different from the result at which I have arrived, the consignee who had sold or dealt with goods to arrive would only have to avail himself of his almost necessary earlier knowledge of the arrival of the goods, to anticipate, by production of his bill of lading, any production by the indorsee of the original, previously indorsed, and thus most seriously affect the transaction of any such dealings, which are effected solely in reliance upon the shipping documents."[1] This appears to be substantially the same line of reasoning adopted by Judge TURNER.

On the whole, I am constrained to believe that the principal case is well decided, because (1) if the bill of lading, as may be fairly presumed from the fact that the shipment was "inland," was an "inland" form, it is not within the rule applicable to maritime or "export" bills, the accomplishment of any part of which avoids all the others. (2) If the transfer of a mere duplicate bill of lading will pass the property, then the way is opened for the negotiation of every "duplicate" issued, and the perpetration of gross frauds thereby. (3) To require a seller or pledgeor of goods in inland transit to produce the "original" bill of lading or to account therefor, and show by other means a good title in himself to the goods, is not an onerous requirement, but one easily and quickly met. Ordinarily, the seller or pledgeor can quickly procure the original bill of lading; if he cannot, and has yet a good title, he can give a bond of indemnity. (4) The common practice of bankers and merchants requires the production of the "original," with which prudent custom Judge TURNER's decision is in wholesome accord.          ADELBERT HAMILTON.

[1] Per FIELD, J., in Glyn, Milis, C. & Co. y. East India Dock Co. 5 Q. B. Div. 136.